ORAL ARGUMENT NOT YET SCHEDULED

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 15-1461

(consolidated with Nos. 15-1498, 16-1012, 16-1029, 16-1038, 16-104 and 16-1057)

GLOBAL TEL*LINK, *ET AL.*,
PETITIONERS,

v.

FEDERAL COMMUNICATIONS COMMISSION
and UNITED STATES OF AMERICA,
RESPONDENTS.

On Petitions for Review from an Order of the
Federal Communications Commission

**BRIEF OF INTERVENORS ULANDIS FORTE, ETHEL PEOPLES, LAURIE LAMANCUSA, DEDRA EMMONS, CHARLES WADE, EARL PEOPLES, DARRELL NELSON, JACKIE LUCAS, THE D.C. PRISONERS' LEGAL SERVICES PROJECT, INC., CITIZENS UNITED FOR THE REHABILITATION OF ERRANTS, PRISON POLICY INITIATIVE, THE HUMAN RIGHTS DEFENSE CENTER, THE CAMPAIGN FOR PRISON PHONE JUSTICE, AND OFFICE OF COMMUNICATION, INC. OF THE UNITED CHURCH OF CHRIST (THE "WRIGHT PETITIONERS")**

Andrew Jay Schwartzman
Drew T. Simshaw
Institute for Public Representation
Georgetown Law
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-9545
dts52@law.georgetown.edu
Counsel to The Wright Petitioners

September 29, 2016

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

### 1. Parties and Amici Curiae.

All parties and Intervenors appearing in this Court are listed in the Petitioners' briefs. The States of Minnesota, Illinois, Massachusetts, New Mexico, New York, Washington, and Washington, D.C. and, separately, the County of Santa Clara and the City and County of San Francisco, have appeared as *amici curiae* in support of Respondents.

### 2. Rulings under review.

The ruling at issue is *Rates for Interstate Inmate Calling Services*, 30 FCCRcd 12763 (2015).

### 3. Related cases.

The Order under review has not previously been the subject of a petition for review in this Court or any other court.

In *Securus Technologies, Inc. v. FCC*, Nos. 13-1280, *et al.*, various petitioners challenged the predecessor order to the order under review. That challenge was held in abeyance pending the rulemaking that led to the order under review. *See Securus Technologies, Inc. v. FCC*, Nos. 13-1280, *et al.* (D.C. Cir. May 19, 2016).

In *Securus Technologies, Inc. v. FCC,* Nos. 16-1321, *et al.* several petitioners have sought review of an FCC order granting partial reconsideration of the order under review. *Rates for Interstate Inmate Calling Services*, Order on Reconsideration, WC Docket No. 12-375, FCC 16-102 (rel. Aug. 9, 2016).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to the United States Court of Appeals for the District of Columbia Circuit R. 26.1 and Fed. R. App. P. 26.1, The D.C. Prisoners' Legal Services Project, Inc., Citizens United for Rehabilitation of Errants, the Prison Policy Initiative, The Campaign for Prison Phone Justice, and Office of Communication, Inc. of the United Church of Christ respectfully submit this Corporate Disclosure Statement.

The D.C. Prisoners'Project is a project of the Washington Lawyers' Committee for Civil Rights & Urban Affairs, Inc., a nonprofit corporation that does not have any parent companies, subsidiaries, or affiliates that have issued shares to the public.

Citizens United for Rehabilitation of Errants ("CURE") is a nonprofit corporation that has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

Prison Policy Initiative is a nonprofit corporation that has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

The Campaign for Prison Phone Justice is jointly led by the Media Action Grassroots Network, Working Narratives, Prison Legal News, and diverse civil and human rights organizations. The Media Action Grassroots Network is a project of the Center for Media Justice, a nonprofit corporation that has no parent companies, subsidiaries, or affiliates that have issued shares to the public. Working Narratives is a nonprofit organization that has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

The Human Rights Defense Center is an organization that advocates on behalf of the human rights of people held in U.S. detention facilities. Its activities include the publication of Prison Legal News and operation of the Prison Phone Justice website.

The Office of Communication, Inc. ("UCC OC, Inc.") is a not-for-profit corporation of the United Church of Christ ("UCC"). The United Church of Christ is a not-for-profit, religious organization, with 5,100 local congregations across the United States. Neither UCC nor UCC, OC Inc. has any parent companies, subsidiaries, or affiliates that have issued shares to the public.

Respectfully submitted,

/s/Andrew Jay Schwartzman
Andrew Jay Schwartzman
Drew T. Simshaw
Counsel to The Wright Petitioners

September 29, 2016

iii

TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS AND RELATED CASES . . . . . . . . . .  i

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

GLOSSARY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATUTES AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUPPLEMENTAL STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . 1

     I.     THE DEVELOPMENT OF THE DYSFUNCTIONAL
           ICS MARKET . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     II.    THE VALUE AND SOCIAL BENEFIT OF LOWER ICS
           RATES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     III.   THE ROLE OF SITE COMMISSIONS . . . . . . . . . . . . . . . . . . . . . 6

     IV.   THE ROLE OF ANCILLARY SERVICE FEES . . . . . . . . . . . . . . 9

     V.    THE WRIGHT PETITIONERS . . . . . . . . . . . . . . . . . . . . . . . . . 13

     VI.   COMMISSION ACTION ON THE WRIGHT PETITIONERS'
           RULEMAKING REQUEST . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

     VII.  ICS REACTION TO THE INTERIM RATES AND
           PARTIAL STAY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     VIII. THE ORDER UNDER REVIEW . . . . . . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.    THE FCC HAS AUTHORITY TO REGULATE ANCILLARY
     CHARGES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.   THE COMMISSION'S LIMITATIONS ON ANCILLARY
     CHARGES ARE NOT ARBITRARY AND CAPRICIOUS . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

# TABLE OF AUTHORITIES

## CASES

*Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224 (D.C. Cir.1999.........................25

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984)..........................................................................................24

*Global Tel*Link v. FCC*, Nos. 15-1461 *et al*. (D.C. Cir. Mar. 7, 2016).................21

*Global Tel*Link v. FCC*, Nos. 15-1461 *et al*. (D.C. Cir. Mar. 23, 2016) ..............21

*In re FCC*, 753 F.3d 1015 (10th Cir. 2014)...........................................................25

*Martha Wright et al. v. Corrections Corp. of America*, No. 00-293
Mem. Op. (D.D.C. Aug. 22, 2001) ..........................................................................13

*National Cable & Telecommunications Association v. FCC*, 567 F.3d 659
(D.C. Cir. 2009) ........................................................................................................26

*Securus Technologies. v. FCC*, No. 13-1280 (D.C. Cir. Jan. 13, 2014).................17

*U.S. v. Southwestern Cable Co.*, 392 U.S. 157 (1968) ...........................................25

## STATUTES AND REGULATIONS

47 U.S.C. §154(i) .....................................................................................................25

47 U.S.C. §201 .................................................................................................13, 21, 23, 27

47 U.S.C. §276.................................................................... 13, 21, 23, 24, 25, 27

## ADMINISTRATIVE MATERIALS

*Promotion of Competitive Networks in Local Telecommunications Markets*,
23 FCCRcd 5385 (2008)....................................................................................25, 26

*Rates for Interstate Inmate Calling Services*,
27 FCCRcd 16629 (2012)..................................................................................14, 15

*Rates for Interstate Inmate Calling Services*, 28 FCCRcd 14107
(2013) .......................................... 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 15, 16, 17, 23, 24, 27

*Rates for Interstate Inmate Calling Services*,
29 FCCRcd 13170 (2014) .................................. 7, 10, 18, 19, 20, 24, 25, 27, 28, 29

## OTHER MATERIALS

Steven J. Jackson, *Ex-Communication: Competition and
Collusion in the U.S. Prison Telephone Industry*,
22 Critical Studies in Media Communication 263, 267 (2005) ........................1, 2, 3

*History of Securus*,
http://www.securustechnologies.com/securus-history .............................................3

*Please Deposit All of Your Money: Kickbacks, Rates,
and Hidden Fees in the Jail Phone Industry* (May 9, 2013) ...................9, 10, 11, 15

Xu, *Castle Harlan Said in Talks to Sell Securus for $640 Million*,
Bloomberg News (Apr. 5, 2013), http://www.bloomberg.com/news/2013-04-
05/castle-harlan-said-in-talks-to-sell-securus-for-640-million.html ........................3

Wagner, *Meet the Prison Bankers Who Profit From the Inmates*,
Time (Sept. 30, 2014),
http://time.com/3446372/criminal-justice-prisoners-profit/ ................................8, 9

*Who Pays?  The True Cost of Incarceration on Families*,
Ella Baker Center for Human Rights, September, 2015 available at
http://whopaysreport.org/ ................................................................................15, 16

*\* Cases and other authorities principally relied upon are marked with asterisks.*

# GLOSSARY

| | |
|---|---|
| **Commission** | Federal Communications Commission |
| **Communications Act** | Communications Act of 1934 (codified as amended at 47 U.S.C. §151 *et seq.*) |
| **FCC Br.** | Brief for Respondents Federal Communications Commission and the United States |
| **HRDC** | Human Rights Defense Center |
| **ICS** | Inmate Calling Services |
| **ICS Br.** | Joint Brief for ICS Provider Petitioners and Supporting Intervenors |
| ***Order*** | *Rates for Interstate Inmate Calling Services*, 30 FCCRcd 12763 (2015) |
| **PPI** | Prison Policy Initiative |
| **Section 201** | 47 U.S.C. §201 |
| **Section 276** | 47 U.S.C. §276 |

vii

## STATUTES AND REGULATIONS

All applicable statutes and regulations are set forth in the addendum to the Brief of Respondents.

## SUPPLEMENTAL STATEMENT OF THE CASE

Pursuant to Circuit Rule 28(d)(2), Intervenors, the Wright Petitioners,[1] adopt Respondents' Statement of the Case.  This supplemental statement provides additional relevant information which can assist this Court in resolution of the case.

## I.     The Development of the Dysfunctional ICS Market.

Prior to the early 1970s, inmates in state and federal prisons were typically limited to making one collect call every three months.[2]  In 1973, in response to studies that demonstrated a strong correlation between weakened prisoner bonds with their community and family, and the likelihood that they would re-offend,[3] the Federal Bureau of Prisons sought to expand inmate telephone access.  State correctional departments also recognized the important role that phone access and

---

[1] The individuals and organizations listed on the cover of this brief have appeared throughout the proceedings below and before this Court in No. 13-1280 and this case.  Even though Ms. Wright died on January 18, 2015, the group continues to be referred to as "the Wright Petitioners" or "Martha Wright, *et al.*"

[2] Steven J. Jackson, *Ex-Communication: Competition and Collusion in the U.S. Prison Telephone Industry*, 22 Critical Studies in Media Communication 263, 267 (2005).

[3] *Id.*

maintaining community connections play in the rehabilitation process and, over the next decade, commercial payphone services were installed in many state correctional facilities across the country.[4]

Under the AT&T-dominated monopoly system that prevailed until the mid-1980s, inmate calls were simply an ordinary line of business that provided affordable, high-quality inmate calling services ("ICS").[5]  AT&T and other providers made operator-assisted collect calling available to inmates at rates comparable to similar services offered to the general public.[6]  Essentially operating as a stable utility system, this service model was effective for years, yielding the rate of return-regulated providers a normal profit while also serving the needs of correctional facilities, prisoners, and their families.

The ICS business model began to change following the anti-trust litigation that led to the breakup of AT&T in 1984.  As telephony began to be viewed as several separate lines of business, competitive phone providers slowly began to make inroads in local phone service and in the newly-created long distance market. Some entrepreneurs saw the potential profitability of ICS and established

---

[4] *Id*. at 267-68.
[5] Human Rights Defense Center ("HRDC") Comments 10 (Jul. 29, 2015)(JA    ).
[6] Letter from the American Bar Association to Julius Genachowski at 2-3 (Oct. 22, 2015)(JA____-____).

specialized carriers to compete for the right to provide ICS as a stand-alone service.[7]

As ICS became increasingly lucrative throughout the 1990s, private equity firms recognized the profitability in the 2000s, which led to a decade of consolidation among ICS providers.  Petitioner Global Tel*Link (GTL) acquired ICS operations previously owned by Verizon and AT&T, among others,[8] before being purchased by American Securities in 2010 for $1 billion, resulting in a $655 million profit for its investors.[9]  Petitioner Securus was formed by the merger of two companies which themselves had previously acquired at least eight other ICS providers.[10]  In 2011, Castle Harlan purchased Securus from H.I.G. Capital for $450 million and then sold the company two years later for $640 million.[11]  Today, Securus, GTL, and CenturyLink dominate the industry, with GTL and Securus alone controlling about 80% of the market.[12]

---

[7] Jackson, *supra* n.2, at 268.

[8] Wright, *et al*. Comments 18-19 (Mar. 25, 2013)(JA____-____).

[9] Wright, *et al*. Comments 19 (Mar. 25, 2013)(JA____).

[10] *See History of Securus*, http://www.securustechnologies.com/securus-history (last visited Sept. 24, 2016).

[11]  Xu, *Castle Harlan Said in Talks to Sell Securus for $640 Million*, Bloomberg News (Apr. 5, 2013), http://www.bloomberg.com/news/2013-04-05/castle-harlan-said-in-talks-to-sell-securus-for-640-million.html.

[12] *Rates for Interstate Inmate Calling Services*, 28 FCCRcd 14107, 14122 ¶29, n.106 (2013)("*2013 Order*")(JA____).

Throughout this period, ICS rates continued to increase despite a steady decline in the cost of service resulting from the industry consolidation, centralization of service, and changes in technology.[13]  The rise of automated systems reduced the need for live operators, and, when needed, reduced the cost of providing them.[14]  ICS providers also began to route calls through centralized calling centers in low-wage locations that reduce overhead and allow use of inexpensive cloud-based technologies.[15]  As a result, ICS providers can now provide service at lower cost and without risking security.

## II.     The Value and Social Benefit of Lower ICS Rates.

*Amici curiae* State of Minnesota, *et al*. have demonstrated the important value and social benefit of lower ICS rates, and Intervenors will not repeat those arguments here.

Because at least 50% of prisoners are incarcerated more than 100 miles away from home, with 10% more than 500 miles away, ICS is the main way families can meaningfully communicate with imprisoned loved ones.[16]  Although prisoners use ICS, it is family, friends, and clergy outside facility walls that

---

[13] *2013 Order*, 28 FCCRcd at 14122 ¶29(JA ___).
[14] *Id.*, 28 FCCRcd at 14122(JA ___).
[15] *See* Wright, *et al*. Comments 17-18 (Mar. 25, 2013)(JA____).
[16] Wright, *et al*. Comments 34 (Mar. 25, 2013)(JA____).

typically end up footing the bill.[17]  Families with imprisoned loved ones struggle

financially, in large part because the prisoner was often the primary breadwinner

before incarceration.[18]  The lost income of the primary wage earner means that a

spouse on the outside must work more to pay for basic needs.[19]  In one study of

families reporting significant barriers to maintaining contact with loved ones, 76%

cited ICS costs as a primary impediment.[20]

   High ICS costs have a profound effect on the 2.7 million children in the

United States who have at least one incarcerated parent,[21] and the 52% of people

incarcerated in state facilities and 63% of people incarcerated in federal facilities

with children.[22]  Only 53% of parents in state prisons reported calling their children

while incarcerated.[23]  Incarcerated mothers are imprisoned an average of 160 miles

away from home, and less than half have had monthly contact with their children.[24]

---

[17] NYU Ctr. Comments 4-5 (Mar. 25, 2013)(JA____-____).

[18] *Id*. at 5(JA____).

[19] Center for Media Justice, *et al*. Reply Comments 4 (Apr. 22, 2013)(JA____).

[20] *See* Leadership Conference on Civil and Human Rights (LCCHR) Comments 3 (Mar. 25, 2013)(JA____).

[21] *2013 Order*, 28 FCCRcd at 14109 ¶2(JA____).

[22] Legal Services for Prisoners With Children Comments 2 (Dec. 8, 2014)(JA____).

[23] Vera Inst. Comments 2 (Mar. 14, 2013)(JA____).

[24] *2013 Order*, 28 FCCRcd at 14130 ¶42(JA____); Comments of Michael Stewart 2 (Feb. 23, 2013)(JA____).

5

Children who lack regular contact with incarcerated parents are more likely to face developmental difficulties and fall into cycles of crime, truancy, and depression.[25]

The record has also demonstrated that lower ICS rates would have cumulative societal benefits. Through increased communication with family and friends, prisoners would feel more connected with the outside world, easing their transition into communities upon release.[26] When released prisoners feel connected to their communities, they are less likely to commit additional crimes, reducing recidivism rates and decreasing criminal justice costs.[27]

## III.    The Role of Site Commissions.

It is essential to stress that for many decades, ICS services were delivered without sharing revenues with correctional facilities. Nor, in calculating rates over those many years, were payments to those authorities ever considered to be a part of what was a compensable cost of providing service.[28] However, over time, the new entrants into the ICS market gained an increasing share of the market, not by offering the lowest rates or best service, but through competing with offers to share portions of rate-revenue through payments which became to be known as "site

---

[25] *2013 Order*, 28 FCCRcd at 14109 ¶2, 14130 ¶42(JA____,____).

[26] *See* Congressional Black Caucus Comments 3-4 (Apr. 22, 2013)(JA____); Wright, *et al*. Comments 2-3 (Apr. 22, 2013)(JA____).

[27] Wright, *et al*. Comments 3-4 (Apr. 22, 2013)(JA____).

[28] *See Rates for Interstate Inmate Calling Services*, 30 FCCRcd 12763, 12824-26 ¶127, 12834 ¶138 ("*2015 Order*")(JA____-____,____).

commissions," in exchange for exclusive contracts with those facilities.[29]  Given that the customers–inmates, their families and their counsel–could not choose competitive offerings, this dysfunctional market favored the awarding of contracts to the ICS providers which were willing to charge the *highest* rates, so they could offer ever-greater site commission payments.[30]

These contracts proved to be highly remunerative for both ICS providers and correctional facilities.  Site commissions became a substantial revenue stream for correctional facilities, with ICS providers contracting to share anywhere from 20 to 88% of their profits.[31]   In 2013 alone, ICS providers paid at least $460 million to correctional facilities;[32] other estimates put the payments as high as $540 million.[33]

ICS providers and penal authorities emphasize that site commission revenue is used for "inmate welfare programs like addiction, rehabilitation, inmate

---

[29] *See 2015 Order*, 30 FCCRcd at 12819 ¶118 n.375(JA____); HRDC Letter 10 (Jul. 29, 2015)(JA____)("Until the late 1980s when Evercom invented the kickback model of giving money to corrections officials in exchange for monopoly contracts, telephone services for prisoners and their families were cheap, high quality and affordable.").

[30] Letter from American Bar Association to Julius Genachowski 3 (Oct. 22, 2015)(JA____); *see also 2015 Order*, 30 FCCRcd at 12821 ¶122(JA____); *Rates for Interstate Inmate Calling Services*, WC Dkt. 12-375, 29 FCC Rcd 13170, 13180-81 ¶22 (2014)("*Second FNPRM*")(JA____-____).

[31] *2013 Order*, 28 FCCRcd at 14125 ¶34(JA____); *see* HRDC Comments 7, Exhibit G (93.9%)(Jan. 13, 2015)(JA____).

[32] *2015 Order*, 30 FCCRcd at 12821 ¶122(JA____); *Second FNPRM*, 29 FCCRcd at 13181 ¶23(JA____).

[33] *2015 Order*, 30 FCCRcd at 12821 ¶122(JA____).

7

education and legal research...."[34]  Leaving aside the issue of whether inmates and

their families should be taxed to provide basic services that should be available as

of right,[35] in fact, much, most or even all of these payments are generally used for

matters wholly unrelated to the provision of ICS services.  Indeed, while Securus

told the Commission that "correctional facilities rely on site commission payments

to fund prison initiatives and administer inmate welfare programs,"[36] its co-counsel

separately stated to the Commission that site commissions "have nothing to do

with the provision" of ICS.[37]  The record establishes that site commissions are in

practice used for prison operation expenses completely unrelated to inmate

welfare, such as employee salaries, benefits, and training, as well as facility

maintenance and equipment.[38]  Even when the funds are nominally directed to

"inmate welfare," some jurisdictions have broadened the definition of the term to

---

[34] State and Local Gov. Pet. Br. 13; *see also* Joint Brief for the ICS Carrier
Petitioners ("ICS Br.") 6 (commissions are "a crucial funding source for sorely
needed rehabilitation programs").

[35]  *See, e.g*, Prisoners Legal Services Comments 3 (Jan. 12, 2015)(describing such
a system as "unjust to consumers and harmful to society")(JA____); HRDC
Comments 2-3 (Jan. 13, 2015)(describing harm of such funding "by prisoners and
their family members through contractual fiat by corrections officials and ICS
providers")(JA____-____).

[36] *See 2015 Order*, 30 FCCRcd at 12822 ¶123 n.400 (citing Securus Reply
Comments 12-13 (Jan. 12, 2015)(JA____-____).

[37] Letter from Andrew Lipman to Marlene Dortch 9 (Apr. 8, 2015)(JA____); *see
also 2015 Order*, 30 FCCRcd at 12822 ¶123 n.400(JA____).

[38] *2013 Order*, 28 FCCRcd at 14125 ¶34(JA____).

include general expenses such as inmate medical care–a necessity–or purchases like air conditioners and ice machines.[39]  In other instances, the payments are not used on correctional facilities at all, but instead go to the states' general funds.[40]  Virginia, for example, has deposited approximately $3.5 million annually from ICS into the Commonwealth's general fund, which finances things like roads, transportation, education, and health care.[41]  Contrary to claims that these payments are used to reimburse costs that correction facilities incur related to the provision of ICS, as the FCC notes, "the record showed that site commissions are an incentive mechanism that induces correctional facilities to award monopoly contracts without regard to the affordability or quality of a provider's services for end users."[42]

## IV.    The Role of Ancillary Service Fees.

In addition to per minute rates, ICS providers have devised other mechanisms to generate revenue.  Since they generally do not have to pay site

---

[39] *See, e.g.,* Wagner, *Meet the Prison Bankers Who Profit From the Inmates*, Time (Sept. 30, 2014), http://time.com/3446372/criminal-justice-prisoners-profit/ ("[W]e started using that money if an inmate went out to medical on an emergency and medical was end-of-year short….We bought air conditioners, ice machines, X-ray machines.").

[40] *See, e.g.*, Prisoners Legal Services of Massachusetts Comments 7 (Mar. 25, 2013)(describing funds transferred to the Commonwealth's General Fund)(JA____); *see also 2015 Order*, 30 FCCRcd at 12823 ¶125(JA____).

[41] *See 2013 Order*, 28 FCCRcd at 14124 ¶33 n.125(JA____).

[42] Brief for Respondents Federal Communications Commission and United States of America ("FCC Br.") 11-12.

commissions on revenue generated from these ancillary charges,[43] these fees have become increasingly attractive to them as site commission rates have been bid up by competition for new contracts.   The record indicates that ancillary fees now provide almost 40%,[44] and perhaps as much as 60% of ICS revenue.[45]

ICS providers have developed a dizzying array of these charges and markups, most of which are unrelated to any actual additional service provided to users.  The Commission stated that

> Ancillary service charges reported in response to the Mandatory Data Collection included an account close-out fee, account transfer fee, automated information services, automated operator recharge fee, bill processing charge for direct billed calls, bill processing fee, bill statement fee, biometric service charge, carrier cost recovery fee, collect call bill statement fee, collect call regulatory fee, collect interstate USF cost recovery fee, continuous voice verification, credit card charge-back fee, credit card processing fee, federal regulatory recovery fee, federal USF, federal USF administration fee for LEC billed calls, federal USF administration fee for non-LEC billed calls, funding fee, funding fee from cashier's check deposit, funding fee from credit/debit cards, funding fee from money order deposit, funding fee from Western Union deposit, live operator recharge fee, live prepaid account set-up fee, load fee, location validation, minimum payment fee, monthly bill statement fee, payment fee—IVR/web, payment fee—live operator, per call administrative fee for calls from county facilities, prepaid accounts, prepaid deposit fees, processing fee, refund fee, regulatory

---

[43] *See* Pay Tel Comments 14 (Mar. 25, 2013)(JA____); Prison Policy Initiative Comments, Exhibit 3, *Please Deposit All of Your Money: Kickbacks, Rates, and Hidden Fees in the Jail Phone Industry* 7 (May 9, 2013)("*PPI Report*")(JA____); *see also Second FNPRM*, 29 FCCRcd at 13203 ¶82(JA____).

[44] *PPI Report* 10 (38%)(JA____).

[45] *2015 Order*, 30 FCCRcd at 12842 ¶154(JA____); *See* Pay Tel *ex parte* Attach. (Jul. 10, 2014)(JA____).

assessment fee, sales tax, state cost recovery fee, state regulatory cost recovery fee for LEC-billed calls, state regulatory cost recovery fee for non-LEC billed calls, state USF, state USF administration fee for LEC billed calls, technology, USF administrative fee, USF federal, USF federal (LEC billed), validation recovery fee, victim information and notification everyday (VINE), voice biometrics, web interface account set-up and recharge fee, and wireless administration fee.[46]

Customers cannot avoid many of these ancillary charges.[47]  Unless a customer opts to incur prohibitive costs for calls made without establishing an account,[48] she must pay ancillary fees to open an account,[49] use an account,[50] not use an account,[51] or close an account.[52]  The Commission found that charges for

---

[46] *2015 Order*, 30 FCCRcd at 12838 n.519(JA____).

[47]  "[F]or every $25 you put on the account, they take $5; then because I use a cell phone for calls, there is a surcharge for cell calls.…Why a surcharge for cells?" *2015 Order*, 30 FCCRcd at 12840 ¶149 n.531 (testimony of Cathrine Nussbaum)(JA____).

[48] ICS providers charge up to $14.99 for a call placed by parties lacking prepaid or debit accounts with the provider.  *PPI Report*, Ex. 22 (JA____).

[49] *See, e.g.*, *2013 Order*, 28 FCCRcd at 14156 ¶90 n.333 (GTL's charges $9.50 to set up an account)(JA____).

[50] *See, e.g.*, *id.*, 28 FCCRcd at 14156 n.335 (GTL charges $9.50 to add $50 to a customer's account)(JA____).

[51] Providers charge up to $4.95 per month for account inactivity. *See 2013 Order*, 28 FCCRcd at 14156-57 ¶90(JA____-____).

[52] For example, GTL charged $5 for customers to receive a refund, which must be requested in writing.  *2013 Order*, 28 FCCRcd at 14156 ¶90 n.335; *PPI Report*, Ex. 22(JA____).  GTL claimed any money left in an inactive account for more than 90 days.  *PPI Report*, Ex. 22(JA____).  Telmate will not issue a cash refund if a customer has less than $50 in an account, charging a $10 fee to close the account and applying any remaining funds to a prepaid calling card. *Id.*, Ex. 45(JA____).

11

adding funds to accounts were especially exploitive.[53]  Because a very substantial

proportion of ICS customers are unbanked, they are reliant on money transfer

services.  The Commission found that, in addition to the ordinary charges imposed

by the transfer services for any transaction, "the record indicates that ICS providers

are imposing significant additional charges, as high as $11.95, for end users to

make account payments via third parties such as Western Union and sharing the

resulting profit with those third-party financial institutions."[54]

The record indicates that most ancillary fees are unrelated to the cost of

providing ICS.[55]  In fact, several jurisdictions have instituted, and ICS companies

have complied with, outright bans on ancillary service charges.[56]  The record

shows that the seven states which chose to prohibit site commissions still provided

effective service and security measures for prisoners, correctional staff, and call

recipients.[57]  This serves as a strong indication that ICS companies are able to

recover ancillary service costs while still providing reasonable ICS rates.[58]

---

[53] *See 2015 Order*, 30 FCCRcd at 12850 ¶171(JA____).

[54] *2015 Order*, 30 FCCRcd at 12850 ¶171 (fn omitted)(JA____).

[55] *2015 Order*, 30 FCCRcd at 12845 ¶161 (ancillary fees are "unrelated to
costs")(JA____).

[56] *See 2015 Order*, 30 FCCRcd at 12847 ¶165(JA____)(citing Comments of Cook
County, IL, (Jan. 12, 2015)(JA____)).

[57] *2013 Order*, 28 FCCRcd at 14127 ¶38(JA____).

[58] *2015 Order*, 30 FCCRcd at 12847 ¶165(JA____).

12

## V.     The Wright Petitioners.

Following the AT&T breakup and the dramatic escalation of rates throughout the 1990s, the resulting cost of ICS posed an increasingly onerous burden on inmates, their families, and society.  During this time, Martha Wright, a retired nurse living in Washington, D.C., found herself paying more than $100 per month to call her grandson, Ulandis Forte, who was incarcerated in Arizona.[59]

Joined by other D.C. residents and defense attorneys collectively referred to as "the Wright Petitioners," Ms. Wright filed a class action in the U.S. District Court for the District of Columbia that sought to end ICS monopolies at private prison facilities, alleging violations of the First and Fourteenth Amendments and the Sherman Anti-Trust Act, as well as the Communications Act.  Finding that the FCC has jurisdiction over allegations invoking Sections 201 and 276 of the Communications Act, Judge Kessler dismissed the complaint without prejudice under the doctrine of primary jurisdiction.[60]  In deferring to the Commission, she stated that the Court "expect[ed] the agency to move with dispatch."[61]

---

[59] *2013 Order*, 28 FCCRcd at 14213, Statement of Acting Chairwoman Mignon Clyburn(JA____).
[60] *Martha Wright et al. v. Corrections Corp. of America*, No. 00-293 Mem. Op. (D.D.C. Aug. 22, 2001).
[61] *Id.* at 15.

Seeking a response from the FCC, the class filed a petition for rulemaking in 2003.[62]  The FCC sought public comment on the petition,[63] but took no further action thereafter.  Four years later, as consolidation among ICS providers continued and as problems with ICS abuses worsened, the Wright Petitioners filed a second petition asking the Commission to cap rates at $0.20 per minute for debit calls and $0.25 per minute for collect calls.[64]  Again, the Commission sought and received comments,[65] but did not act.

## VI.    Commission Action on the Wright Petitioners' Rulemaking Request.

As ICS prices and charges continued to rise, the FCC took notice of the issue and, in December 2012, the Commission acted on the Wright Petitioners' request for action by issuing a Notice of Proposed Rulemaking with respect to interstate rates ("Notice").[66]  Taking note of the "substantial renewed interest and comment in this docket highlighting both the wide disparity among interstate interexchange ICS rate levels and significant public interest concerns," the Commission requested

---

[62] *Martha Wright et al. Petition for Rulemaking*, Dkt. 96-128 (Nov. 3, 2003)(JA____).

[63] *Petition for Rulemaking Filed Regarding Issues Related to Inmate Calling Services; Pleading Cycle Established*, 69 FR 2697 (Jan. 20, 2004)(JA____).

[64] *Alternative Wright Petition*, Dkt. 96-128 (Mar. 1, 2007)(JA____).

[65] *Comment Sought on Alternative Rulemaking Proposal Regarding Issues Related to Inmate Calling Services*, 22 FCCRcd 4229 (2007)(JA____).

[66] *Rates for Interstate Inmate Calling Services*, Notice of Proposed Rulemaking, 27 FCCRcd 16629 (2012)("Notice")(JA____).

14

comments to "refresh the record and consider whether changes to our rules are necessary to ensure just and reasonable ICS rates for interstate, long distance calling at publicly- and privately-administered correctional facilities."[67]  The Notice also asked for "specific, detailed cost information and other relevant data" to determine appropriate caps, and asked how it should treat other charges, such as monthly account fees, that must be paid to use the service.[68]

Public response was overwhelming, demonstrating the depth of the problem, the harms incurred by excessive rates and the need for remedial action. Tens of thousands of members of the public urged the Commission to lower ICS rates,[69] and over 100 prison reform, social justice and professional legal organizations developed a robust record demonstrating the need for action.  For example, HRDC provided comprehensive data on ICS rates,[70] and Prison Policy Initiative (PPI) submitted a report detailing how ICS providers use ancillary fees to increase customers' bills.[71]  The record also included stories of financial struggle caused by

---

[67] *Id*., 27 FCCRcd at 16629-30 (footnote omitted)(JA____-____).

[68] *Id*., 27 FCCRcd at 16637 ¶20, 16641 ¶33(JA____,____).

[69] One organization submitted comments signed by more than 24,000 people, including family members and friends of prisoners.  Color of Change Comments (Mar. 25, 2013)(JA____).  *See also* 4,822 Comments filed by Credo Mobile (Mar. 23, 2013)(JA____).

[70] *See* HRDC Comments (Mar. 25, 2013)(JA____).

[71] *PPI Report*, *supra* n.43(JA____).

high ICS rates,[72] emotional burdens imposed on children and families,[73] and conclusive proof that society itself benefits when prisoners can afford to communicate with their loved ones.[74]

Nine months later, the FCC examined the record. Despite the fact that ICS operators had not assisted the inquiry by providing adequate data upon which to take final action,[75] the Commission found that the record demonstrated the need for immediate action. It found, *inter alia*, that there are important societal benefits from reduced rates, such as reduction in recidivism,[76] facilitation of parent-child communications[77] and reduced costs and improved quality of legal representation.[78] Accordingly, it adopted interim rate caps for interstate calls of

---

[72] *See, e.g.*, *2013 Order*, 28 FCCRcd at 14130 ¶42(JA____);Wagner, *Prison Bankers Cash in on Captive Customers*, Center for Public Integrity (Sept. 30, 2014)(cited in PPI Comments 3 (Jan. 12, 2015))(JA____). *See also Who Pays? The True Cost of Incarceration on Families*, Ella Baker Center for Human Rights, September, 2015 at 7-9, available at http://whopaysreport.org/.

[73] *See, e.g.*, Letter from Prison Policy Initiative (Jun. 20, 2014)(emphasis added) (JA ___). *See also The True Cost of Incarceration on Families*, *supra* n.72.

[74] *See., e.g.*, Bazelon Declaration, Attached to Wright Petitioners' Comments (Mar. 25, 2013)(JA____).

[75] *See* Wright, *et al*. Comments 10 n.31 (Mar. 25, 2013)(JA____); Wright, *et al*. Reply Comments i, 11, 13, 14 (Apr. 22, 2013)(JA____,____,____,____); Wright, *et al*. *ex parte* 1 (Aug. 2, 2013)(JA____).

[76] *2013 Order*, 28 FCCRcd at 14109 ¶2(JA____).

[77] *Id*., 28 FCCRcd at 14109 (JA____).

[78] *Id*., 28 FCCRcd at 14131 ¶44(JA____).

16

$0.21 for debit and prepaid calls and $0.25 for collect calls,[79] and initiated a one-time mandatory reporting of certain data from ICS providers in order to obtain more useful, reliable data from which it could adopt more precise permanent rate caps.[80]  Finding that sometimes questionable and non-cost-based ancillary fees were proliferating, the Commission determined that ancillary fees should be cost-based.[81]  The *2013 Order* also reaffirmed that site commission payments were not part of the cost of providing ICS and therefore not compensable.[82]  Finding a wide variation among the states with respect to intrastate rates and indications that rates were excessive in many cases, it asked whether it has the authority to regulate those practices and, if so, how it should do so.[83]

In November 2013, a number of ICS providers and state and municipal bodies and officers sought review of the Commission's *2013 Order* in this Court. On January 13, 2014, a motions panel of this Court issued a partial stay prior to the effectiveness of the Order.[84]  As a result, the interim interstate rate caps went into

---

[79] *Id*., 28 FCCRcd at 14138-14153 ¶¶59-81(JA____-____).

[80] *Id*., 28 FCCRcd at 14172 ¶124(JA____).

[81] *Id*., 28 FCCRcd at 14111 ¶5, 14132 ¶47(JA____,____).

[82] *Id*., 28 FCCRcd at 14135 ¶54(JA____).

[83] *Id*., 28 FCCRcd at 14173 ¶128(JA____).

[84] *Pets. for stay granted in part sub nom. Securus Technologies. v. FCC*, No. 13-1280 (D.C. Cir. Jan. 13, 2014).

effect, but the requirement that ancillary service charges be based on costs, did

not.[85]

## VII.   ICS Reaction to the Interim Interstate Rates and Partial Stay.

ICS companies' response to the *2013 Order* and this Court's partial stay is

notable in two respects.

First, interstate debit and prepaid rates decreased by an average of 32%, and

collect rates decreased by an average of 44%.[86]  This generated an increase in call

volume by as much as 70%,[87] to the benefit of both ICS providers and customers.

*Amici* Santa Clara and San Francisco report that interstate call volume increased

almost 15-fold after the interstate interim rate cap was introduced, so that the ICS

providers' total revenue doubled when per minute rates were reduced from $1.36

to $0.21.[88]

Second, in numerous instances, ICS companies circumvented the interim

rate caps by jacking up ancillary fees.[89]  With the partial stay in effect, increases to

---

[85] *See 2015 Order*, 30 FCCRcd at 12773 ¶16(JA____)("Due to the partial stay, the requirement that ancillary service charges be based on costs did not go into effect.").

[86] *See 2015 Order*, 30 FCCRcd at 12772 ¶14(JA____).

[87] *Id.*, 30 FCCRcd at 12772(JA____).

[88] Brief of County of Santa Clara, *et al*. at 3.

[89] *2015 Order*, 30 FCCRcd at 12842 ¶154(JA____); s*ee Second FNPRM*, 29 FCCRcd at 13174 ¶5(JA____)(citing 2014 ICS Workshop Transcript at 169)(JA____)); Martha Wright, *et al. ex parte* 1(July 14, 2014)(JA____)("Several

ancillary fees went largely unrestrained.[90]  And, since some 80% of calls are

intrastate, ICS companies also maneuvered around the 2013 interim interstate rate

caps by raising intrastate rates, when possible under state laws.[91]  The record

demonstrates that these increases, like the increases in ancillary service charges,

were not tied to any increased cost of service, but rather were additional attempts

to increase revenue following the 2013 interim interstate rate caps.[92]  Accordingly,

in October 2014, the Commission issued a further NPRM seeking more

comprehensive ICS reform to address inter- and intrastate rate caps, site

commissions, and ancillary fees.[93]  In doing so, the Commission cited evidence

---

of the ICS providers have increased their ancillary fees in light of the imposition of
the February 2014 rate cap on Interstate ICS rates…")("[T]he increase in these fees
are solely being used to recover a portion of the revenue previously earned by
charging exorbitant Interstate ICS rates."); HRDC Comments 1 (Aug. 8,
2015)(JA____)("[A]ncillary fees related to inmate calling services…increased
after the Order implementing interstate ICS rate regulation became effective in
February 2014…."); HRDC Reply Comments 6 (Feb. 8, 2016)(JA____)("[A]fter
the FCC took the first steps to reign in what had become an out-of-control market
by setting modest rate caps on  interstate calls, the ICS providers responded–as we
would expect–by increasing unregulated  intrastate rates and ancillary fees to
replace lost revenue.").

[90] *See 2015 Order*, 30 FCCRcd at 12773 ¶16 ("Due to the partial stay, the
requirement that ancillary service charges be based on costs did not go into effect.
As a result, there have been no reforms to ancillary service charges and fees and
they have continued to increase since the 2013 Order.")(JA____).

[91] *See 2015 Order*, 30 FCCRcd at 12766 ¶2, 12768 ¶7(JA____,____).

[92] *See 2015 Order*, 30 FCCRcd at 12774 ¶19(JA____)(citing *Second FNPRM*, 29
FCCRcd at 13173-74 ¶5(JA____-____)).

[93] *Second FNPRM*, *supra* n.30, 29 FCCRcd at 13170(JA____).

that intrastate rates had increased since the *2013 Order*,[94] and that ancillary fees

had "increased in number, price, or both, leading to further expense for ICS

consumers in a manner that is often unrelated to the cost of providing ICS."[95]  It

also cited further evidence that communication between inmates and loved ones

lowers recidivism rates and benefits society.[96]

## VIII.  The Order Under Review.

Based on data collected on ICS costs and commentary from the public, the

FCC issued the order now under review.[97]  In the *2015 Order*, the Commission

capped all inter- and intrastate rates,[98] reaffirmed that site commissions are not

costs "reasonably related to the provision of [ICS],"[99] addressed ancillary services

by limiting how much providers may charge for a small list of enumerated

permitted fee categories,[100] and implemented various reporting requirements.

---

[94] *See, e.g.*, *Second FNPRM*, 29 FCCRcd at 13174 ¶6(JA____) (citing 2014 ICS Workshop Transcript at 169 (Lee Petro, Counsel to Petitioners) ("We've seen now with the reduction  in the interstate rates an increase in the intrastate rates and an increase in the ancillary fees.")(JA____)).

[95] *See Second FNPRM*, 29 FCCRcd at 13174 ¶6(JA____)(citing 2014 ICS Workshop Transcript at 137, 140 (Vincent Townsend, President, Pay Tel)(JA____); *see also* Letter from Marcus W. Trathen, Counsel to Pay Tel, to Marlene Dortch at Attach. "FCC Workshop on Inmate Calling Services –Panel 2, Ancillary Charges" (Jul. 10, 2014)(JA____).

[96] *See Second FNPRM*, 29 FCCRcd at 13171 ¶2(JA____).

[97] *2015 Order*, *supra* n.28(JA____).

[98] *2015 Order*, 30 FCCRcd at 12775 ¶22 (JA____); *see also* FCC Br. 8-10.

[99] *2015 Order*, 30 FCCRcd at 12821 ¶123 (JA____); *see also* FCC Br. 10-12.

[100] *2015 Order*, 30 FCCRcd at 12839 ¶147 (JA____); *see also* FCC Br. 12-13.

As explained more fully in the Respondents' brief, several ICS parties unsuccessfully requested administrative stays of the newly-adopted rule.[101]  They also sought review in this Court and, joined by some state and local governmental interests, sought a stay from this Court.  A motions panel of this Court issued a partial stay on March 7, 2016.[102]   A second motions panel, with Judge Millet dissenting, extended the stay by Order dated March 23, 2016.[103]

## SUMMARY OF ARGUMENT

Some, but not all, of the ICS Petitioners challenge the Commission's restriction on all but five categories of ancillary service fees, characterizing them as being "financial transactions-not calling services" which are not within the scope of Sections 201 or 276.  Many of the fees at issue have nothing to do with financial transactions, but the Commission clearly has authority to regulate those fees as well, and is entitled to deference in its construction of Sections 201 and 276.  The fact that some of the charges involve the way that customers pay for calls does not alter the Commission's authority, especially where, as here, these fees

---

[101] *See* FCC Br. 14; *Rates for Interstate Inmate Calling Services*, 31 FCCRcd 261(WCB 2016)(JA____).
[102] *Global Tel\*Link v. FCC*, Nos. 15-1461 *et al*. (D.C. Cir. Mar. 7, 2016)(per curium).
[103] *Global Tel\*Link v. FCC*, Nos. 15-1461 *et al*. (D.C. Cir. Mar. 23, 2016)(per curium, Millet J. dissenting).

21

cannot be avoided.  They are indubitably "directly related to provision of ICS," as the Commission has construed the statute.

Longstanding precedent bolsters the Commission's interpretation.  This Court has held that the Commission's power is not circumscribed because it may have incidental implications for entities beyond its jurisdiction.

The Commission's decisions as to which ancillary fees are permissible as cost-based and its restriction of others was based on its meticulous examination of the record.  That review showed that ancillary charges, including newly-created categories, have been used to circumvent rate caps.  As to credit-card and debit-card fees, the Commission did not ignore claims that rates should be higher, but rejected them based on stated reasons.  Nor did it disregard evidence as to single-call services.  While the challenging Petitioners characterize these services as "valuable," to the extent that they impose a markup over what would ordinarily be charged for a money transfer which is split with the transfer service, it is certainly not of value to inmates and their families.  Insofar as the challenging Petitioners seek to charge more than the regular charges for such calls, the Commission found no cost justification for the upcharge.

## ARGUMENT

## I.      The FCC Has Authority to Regulate Ancillary Charges.

Some, but not all,[104] of the ICS Petitioners make a desultory challenge to the Commission's general authority to regulate intrastate ancillary charges based upon their theory that Section 276 is designed only to provide a floor, and not a ceiling, for providers.  The Respondents' brief thoroughly rebuts this argument at pp. 28-39.

The same Petitioners make a much more pointed challenge to the particular rules the Commission adopted, claiming "[t]he fees that the FCC purports to regulate (or bar) are for financial transactions-not calling services-and are therefore outside the scope of §276(b)(1)(A) altogether."[105]  That blunderbuss characterization would effectively nullify any Commission authority to oversee ancillary fees, notwithstanding the plain directive in §276(d) defining "payphone service" as including "any ancillary services."[106]  Their argument is not only illogical, but fails to mention, much less address, the Commission's interpretation

---

[104] *See* ICS Br. 47 n.32.
[105] ICS Br. 48.
[106] They make a similar, equally unpersuasive, argument as to the Commission's interstate authority under Section 201.  *See 2013 Order*, 28 FCCRcd at 14158 ¶91 n.341 (citing precedent)(JA____).

23

of Section 276, which, under *Chevron*,[107] is the proper starting place for any

statutory challenge.  The Commission definitively defined the statutory term and

construed its jurisdiction in its *2013 Order*, finding that

> [I]nterstate ICS rates must be cost-based, and to be
> compensable costs must be reasonably and directly related to
> provision of ICS.  Ancillary service charges are no exception;
> they also fall within this standard and the Commission has the
> jurisdiction and authority to regulate them****Section 276 of
> the Act defines "payphone service" to encompass "the
> provision of inmate telephone service in correctional
> institutions, and any *ancillary* services," and requires that
> providers be "fairly compensated."  The services associated
> with these ancillary charges are…"ancillary" for purposes of
> section 276****Therefore, even if a provider's interstate ICS
> rates are otherwise in compliance with the requirements of
> this Order, the provider may still be found in violation of the
> Act and our rules if its ancillary service charges are not cost-
> based.[108]

The fact that some of the charges that the FCC addressed involve the

way in which customers pay for calls does not alter the Commission's

authority, especially where, as in many cases, these fees cannot be avoided.[109]

These charges cannot be incurred except in connection with, and for the

purpose of, placing calls and, as such, are indubitably "directly related to

provision of ICS" as defined by the Commission.  This is underscored by the

---

[107] *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837
(1984).

[108] *2013 Order* 28 FCCRcd at 14157-58 ¶91 (emphasis in the original)(JA____).

[109] *See supra* pp. 11-12.

fact that, as the Commission has stressed, and recent history has

demonstrated,[110] ancillary fees can be used "circumvent" the Commission's

rate caps.[111]

Longstanding precedent bolsters the Commission's interpretation.[112]

Even if there were doubt as to whether Section 276 reaches "financial

transactions," this Court has held that the Commission's power is not

circumscribed because it may have incidental implications for entities beyond

its jurisdiction, and that capping a charge does not amount to regulation of

those bodies.[113]  It is well established that the FCC has the power to "regulate

the contractual or other arrangements between common carriers and other

entities, even those entities that are generally not subject to Commission

---

[110] *See supra* n.89.

[111] *See, e.g.*, *2015 Order*, 30 FCCRcd at 12860 ¶194(JA____); *see also*, *Second FNPRM*, 29 FCCRcd at 13173-74 ¶5 (JA____-____)("[R]egulating ancillary charges was a necessary aspect of our cost-based reforms, as otherwise providers could simply increase their ancillary charges to offset lower rates subject to our caps.").

[112] It also bears mention that 47 U.S.C. §154(i) gives the Commission broad ancillary authority over activities related to matters subject to its jurisdiction.  *2015 Order*, 30 FCCRcd at ¶335(JA____); *see U.S. v. Southwestern Cable Co.*, 392 U.S. 157 (1968).

[113] *Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1230 (D.C. Cir.1999).  *See also In re FCC*, 753 F.3d 1015, 1068 (10th Cir. 2014).

regulation."[114]  Indeed, "most every agency action has relatively immediate effects for parties beyond those directly subject to regulation."[115]

## II.     The Commission's Limitations on Ancillary Charges Are Not Arbitrary and Capricious.

The ICS providers challenging the Commission's ancillary fee orders also alleged that the Commission's action was arbitrary and capricious because it denies cost recovery and discourages development of innovation.[116]  This argument overlooks the meticulous examination the FCC undertook as well as steps it took to afford flexibility where justified.

While the challenge is framed in general terms as against all fees which the Commission prohibited or capped, the brief is largely directed at credit-card and debit-card fees and its single-call services, which are euphemistically described as "premium billing options."[117]  In addition, the brief also makes a half-hearted argument that prohibiting recovery of "all fees not specifically listed" is arbitrary and capricious because the fees are "necessary to recoup the costs ICS providers

---

[114] *Promotion of Competitive Networks in Local Telecommunications Markets*, 23 FCCRcd 5385, 5391 (2008)(citation omitted).

[115] *National Cable & Telecommunications Association v. FCC*, 567 F.3d 659, 666 (D.C. Cir. 2009).

[116] ICS Br. 51-53.

[117] The notion that a party without an account seeking to communicate with family or counsel in an emergency is "opting" to an upgraded first-class service as if this were not a coerced transaction is laughable.

26

incur...,"[118] although the challenging Petitioners do not say anything at all to explain why the Commission was wrong in finding that these fees are not actually cost-based.

Having determined in the *2013 Order* that ancillary fees must be cost-based,[119] the Commission sought comment on "on how the Commission can ensure, going forward, that ancillary charges are just, reasonable, and cost-based,"[120] including specific requests for data regarding the "use [of] third parties to process debit and prepaid transactions,"[121] "the cost drivers underlying ICS providers' ancillary service charges,"[122] and "whether some ancillary services charges constitute unjust and unreasonable practices, in violation of section 201(b), or a practice that would lead to unfair rates in violation of section 276."[123] Then, after finding that the record had adduced "evidence indicat[ing] that ancillary charges have increased" since the *2013 Order*,[124] and "suggesting that any reforms

---

[118] ICS Br. at 54.

[119] *2013 Order*, 28 FCCRcd at 14187 ¶168(JA_____).

[120] *Id.*, 28 FCCRcd at 14187 (JA_____).

[121] *Id.*, 28 FCCRcd at 14187-88 (JA_____-_____).

[122] *Id.*, 28 FCCRcd at 14188 ¶170(JA_____).

[123] *Id.*, 28 FCCRcd at 14188 ¶171(JA___).

[124] *Second FNPRM*, 29 FCCRcd at 13203 ¶82(JA_____)(citing Pay Tel July 10, 2014 Ex Parte Letter, Attach. ("FCC Workshop on Inmate Calling Services–Panel 2, Ancillary Charges"))(JA_____); Alabama PSC FNPRM Comments at 6 (the Alabama PSC "observed a tendency for the ICS industry to increase both the number and magnitude of fees")(JA_____)).

27

limited to ICS rates could be circumvented through increased and new ancillary charges,"[125] the Commission sought "comment on prohibiting separate charges for certain ancillary services that are basic requirements for consumers to gain access to ICS, and that are typically recovered through rates as part of normal utility overhead costs."[126]

The *2015 Order* was based on this record, which "confirms that ancillary service charges have not only increased, but new charges have appeared,"[127] and evidence "that different providers may describe the same charge by different names."[128]  The Commission therefore reasonably found that "our statutory directive requires us to adopt reforms to limit ancillary service charges,"[129] and established a "limited list of ancillary fees that the Commission will permit ICS providers to charge."[130]

This thorough, transparent process cannot reasonably be characterized by the challenging providers as "lack[ing] any supporting cost evidence" for setting

---

[125] *Second FNPRM*, 29 FCCRcd at 13203 ¶82 (citing, *e.g.*, 2014 ICS Workshop Transcript at 140 (Vincent Townsend, President, Pay Tel) ("They've increased– payment fees have gone up with most providers since then"))(JA____).

[126] *Second FNPRM*, 29 FCCRcd at 13205 ¶87(JA____).

[127] *2015 Order*, 30 FCCRcd at 12839 ¶145(JA____).

[128] *Id*., 30 FCCRcd at 12839 ¶146(JA____).

[129] *Id*., 30 FCCRcd at 12839 ¶145(JA____).

[130] *Id*., 30 FCCRcd at 12839 ¶147(JA____).

maxima for credit-card and debit-card fees.[131]  The Commission explains that it "specifically sought comment on automated payment fees in the *Second FNPRM*," and that its approach is supported not only by the Alabama PSC, which also concluded that a $3.00 cap for credit card processing and bill processing is appropriate, and Pay Tel, which charges $3.00 for automated payments, but also CenturyLink, which explained that ICS providers incur little or no cost in employing third party payment agents.[132]  The Commission did not ignore claims that costs are higher; it rejected them and gave a reason for doing so: "The credit-card processing costs that Securus cites indicate to us that it is an outlier, especially since…companies that are much smaller than Securus acknowledge that they can process credit card payments at a $3.00 rate."[133]

Nor can the Commission be said to have "improperly disregarded" evidence pertaining to the cost of single-call services.[134]  The Challengers tout this offering as "extremely valuable,"[135] but if this is a reference to the practice of adding a

---

[131] ICS Br. at 51.

[132] *2015 Order*, 30 FCCRcd at 12847-48 ¶167(JA____-____).  *See also*, CenturyLink Reply Comments 28 (Jan. 27, 2015)("The key costs of third party funding are borne by the third party provider, not by the ICS provider. Allowing providers to assess add-on fees for third party funding could encourage transaction fee 'churning.'")(JA____).

[133] *2015 Order*, 30 FCCRcd at 12848 ¶167(JA____).

[134] ICS Br. at 53.

[135] *Id.*

markup over what would ordinarily be charged for a money transfer and splitting that sum with the transfer service, it is certainly not of value to the customers being ripped off. If this is simply referring to charging more than the regular charge for such calls, the Commission explained (and the selective quotation in the challenging providers' brief conveniently ignores) that "the record is replete with evidence that some of these services are being used in a manner to inflate charges, and may be offered at unjust, unreasonable, or unfair rates, and/or at rates above our interim rate caps or rate caps adopted in this Order," and that the record "highlights substantial end-user confusion regarding single-call services."[136] The fact that there may be "some efficiencies"[137] from these arrangements suggests, if anything, that this should reduce costs, and thus allow lower, not higher, rates.

Moreover, the claim that the Commission's action to forestall evasion of the rate caps "will prevent development of new and better services,"[138] is entirely unfounded. The Commission's rule leaves substantial flexibility because the permissible categories of ancillary service charges are broadly defined, without regard to the technology used.[139] And, importantly, providers seeking to adopt

---

[136] *2015 Order*, 30 FCCRcd at 12855 ¶182 (citations omitted)(JA____).
[137] ICS Br. 53.
[138] ICS Br. 54.
[139] *See* FCC Br. 54.

30

new categories of charges may seek approval of such categories through a waiver process or by filing a petition for rulemaking.[140]

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision of the Commission and grant all such other relief as may be just and proper.

Respectfully submitted,

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman
Drew T. Simshaw
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, DC 20001
(202) 662-9545
dts52@law.georgetown.edu
Counsel to The Wright Petitioners

September 29, 2016

---

[140] *See id.*; *2015 Order*, 30 FCCRcd at 12870-72 ¶¶217-220(JA____-____), 12864 ¶204 n.729 ("ICS providers are free to file a waiver [of rate caps or ancillary fee caps] if circumstances warrant.")(JA____).

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable type-volume limitations.  Exclusive of the portions exempted by  Federal Rules of Appellate Procedure Rule 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1), this brief contains 7123 words.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point Times Roman, a proportionally spaced typeface.

Respectfully submitted,

/s/ Andrew Jay Schwartzman

Andrew Jay Schwartzman

September 29, 2016

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the appellate CM/ECF system on September 29, 2016.

I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Respectfully submitted,

/s/ Andrew Jay Schwartzman
Andrew Jay Schwartzman

September 29, 2016